UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


BARONIUS PRESS, LTD.,            )
                                 )
              Plaintiff,         )    No. 3:16-CV-695
                                 )
         vs.                     )
                                 )
SAINT BENEDICT PRESS, LLC,       )
                                 )
              Defendant.         )
_____)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GRAHAM C. MULLEN
UNITED STATES DISTRICT COURT JUDGE
OCTOBER 3, 2018


APPEARANCES:

On Behalf of the Plaintiff:

     MARK W. ISHMAN, ESQ.
     Ishman Law Firm, PC
     9660 Falls of Neuse Road, Suite 138-350
     Raleigh, North Carolina 27615

On Behalf of the Defendant:

     NATALIE DAWN POTTER, ESQ.
     JONATHAN E. BUCHAN, JR.
     Essex Richards, PA
     1701 South Boulevard
     Charlotte, North Carolina 28203




                Cheryl A. Nuccio, RMR-CRR
                 Official Court Reporter
                United States District Court
                 Charlotte, North Carolina

P R O C E E D I N G S

WEDNESDAY MORNING, OCTOBER 3, 2018

       (Court called to order at 10:36 a.m.)

       THE COURT:  All right.  Good morning, counsel.
We're going to deal -- there's this pack that I'll deal with
another time.  Then there's this pack that's all been briefed
and ready to roll.

       Mr. Buchan, how much money is involved in this?

       MR. BUCHAN:  Your Honor, from the defendant's
standpoint, we don't believe there's any liability, but that
aside -- I want to make sure the Court understands that.  That
aside, if defendant were to be found to have infringed, the
measure of damages on the Copyright Act is as follows:
Plaintiffs actual damages.

       THE COURT:  Yep.

       MR. BUCHAN:  Any profits of defendant that have not
been taken into account in computing those actual damages.

       With regard to defendant's profits, Your Honor, we
had provided plaintiff with extensive information regarding
defendant's sales and revenue figures for the relevant time --

       THE COURT:  Just how much money -- how many sales?
How many dollars in sales are we talking about from your
client for this piece of paper?

       MR. BUCHAN:  Your Honor, for the relevant time
period, which we believe is December -- excuse me, we believe

1  is April 2014 to date, as of the most recent computation in

2  the last week or so, it is -- the gross revenues for this

3  title are less than $110,000.

4        THE COURT:  All right.  For Baronius, how many of

5  these have you guys sold?

6        MR. ISHMAN:  Good morning, Your Honor.  Mark Ishman.

7        Based on the latest production that I believe was

8  produced to us in September, there was 5,545 copies during

9  this relevant time period.

10        THE COURT:  And at how much per copy?  Come on?

11        MR. ISHMAN:  And our formula for our profits is

12  $63.78 per copy, totaling $353,634.55.

13        THE COURT:  You guys can't afford a damn federal

14  court war over this.  Neither one of you can.  This is

15  ridiculous.

16        Also, it's ridiculous that you all haven't read the

17  pretrial order that says before you start filing all this

18  stuff, you're supposed to get together and get together with

19  me ahead of time.  Do you understand that now?

20        MR. ISHMAN:  I do, Your Honor.

21        THE COURT:  Okay.  I know Mr. Buchan does.

22        All right.  Let's go.  You have a -- you have a

23  plaintiff's motion to compel discovery responses from the

24  defendant.  Do you wish to be heard?

25        MR. ISHMAN:  I do, Your Honor.

1           THE COURT:  You may proceed.

2           MR. ISHMAN:  As you know, Rule 26 provides you very

3  broad discretion on a motion to compel.  And if you find that

4  party's failure to provide or permit discovery, you also apply

5  remedies available to you.  One would be reasonable expenses

6  caused by the failure; and two, another option would be

7  adverse admissions for the intentional delays or misdirection

8  of failing to respond to discovery requests in the fullest

9  capacity.

10          If it may please the Court, I have prepared a

11 three-ring binder.

12          THE COURT:  You may present it.

13          MR. ISHMAN:  On the inside folder we provided an

14 index that might be -- we didn't include it in the three-ring

15 binder because it may be helpful throughout today to know what

16 these tabs are referencing to.

17          The first tab here is pretty much our outline of

18 our -- of plaintiff's arguments here today.  The good news I'd

19 like to report to the Court, over -- over the months we have

20 been able to work together and resolve most of our noted

21 issues.  As of today's hearing, we have eight production

22 requests that are deficient, and then we have another two that

23 are incorporated in our second motion to compel that it makes

24 sense for us to punt those two requests to the second motion.

25          So if we could go to tab 5.  Tab 5 contains an

1  overview of how this all started.

2         March 22nd, 2013, plaintiff sent a letter to the

3  defendant saying we're the copyright owners.  Please stop.

4  There is no demand for money.  There is no threat of

5  litigation.  It says -- they provided the rights that they

6  required and said please stop.

7         That was then, if you turn the page, responded to by

8  the Monk Law Firm on behalf of defendant --

9         THE COURT:  Okay.  Let's get to what we're talking

10 about here.  What are you -- what do you say they are supposed

11 to do that they haven't done that you want me to tell them to

12 do?

13        MR. ISHMAN:  I apologize, Your Honor.  Thank you.

14 If I deviate from our production request issues, I apologize.

15        This all started when we served our interrogatories

16 and production requests on October 10th.

17        On November 24th, 2017, we received their responses.

18        On January 10th, 2018, we provided a notice of

19 deficiency.

20        On March 15th we had a meet and confer conference

21 and at that time defendant let us know that they were not

22 going to supplement any more documents.

23        In response to that, on May 10th we sent another

24 letter saying here are still outstanding issues.  Can you

25 please cure these deficiencies.

1          On May 16th we received a correspondence that it's
2    under review and we'll get back to you.
3          May 24th we did not receive a response, and so on
4    May 30th we filed a motion to compel, and an extension was
5    granted.
6          On June 26th defendant supplemented their
7    production.
8          And on June 29th filed the response to the motion to
9    compel.
10          And June 12th we filed our reply.
11          So that leads us to the eight open items that are
12   deficient.
13          Starting off, request number 11.  Exhibit 2 to the
14   complaint is a letter written by Mr. Conor Gallagher who is
15   the vice president of publishing and associate general
16   counsel.  And he states:  In response to your letter" -- this
17   is plaintiff's letter -- and your earlier ones of August 9,
18   2013 and March 22, 2013, Defendant has conducted an extensive
19   audit of our correspondence files and publication history for
20   *Fundamentals*."
21          And this is on page 5, Your Honor.  I'm sorry if I
22   didn't make that notice to you.
23          In response to this production request, defendant
24   objects to the extent it seeks to discover documents and
25   things protected by attorney/client privilege, work product

privilege, or it may not lead to discoverable admission of evidence. And defendant reviewed several hundred, perhaps thousands, of documents in investigating plaintiff's claim, most of which are not relevant to this case, and did not identify any documents that were produced.

Then on February 2nd, 2018, defendant stated, "As we stated in our client's original responses, to produce every document reviewed during this process would be unduly burdensome on our client and the burden and expense of responding would far outweigh its likely benefit. Saint Benedict has already produced the documents uncovered in its investigation relevant to this request."

When asked to produce the supporting documents on June 26th, the defendant states, Defendant disagrees as defendant previously produced such documents on November 24th, and so see Bates stamped documents SBPP-2172 to 2182, ten documents, as well as they're going to be producing an updated privilege log.

In our production -- written discovery requests and interrogatory requests, our very first interrogatory states, "For each document that you produce in response to a discovery request, please identify the specific request or requests to which each document pertains." This is a pretty standard interrogatory request that I've been used to seeing in my practice. And that wasn't followed.

1    And only on June 26th when we determined -- is when
2  we got an answer about their extensive -- excuse me, extensive
3  audit of our correspondence files and publication history.
4  Well, we're talking about ten documents.
5    So what we've done is we've looked through our
6  documents that we've gathered as well as their documents.  If
7  you go to page 7, the Current Status.  Correspondence files.
8  So the first one is correspondence between defendant and Nova.
9  And in the left column you'll see the documents that
10 defendant -- that plaintiff has produced and in the right
11 column you'll see the documents that defendant produced or did
12 not disclose.  And you can see that there are two entries that
13 are missed by the defendant, yet we produced them,
14 communications between them and a third party.
15    Next we have correspondence between defendant and
16 Mr. Press.  Plaintiff obtained correspondence between the
17 defendant and Mercier Press and disclosed them.
18    On June 26th defendant placed in its privilege log
19 documents certain emails between them and Mercier Press
20 claiming that it's privileged.  After being compelled
21 defendant released some of these emails.  And now if you look
22 on the left, these are the documents that plaintiff has
23 produced, and on the right, these are the documents that
24 defendant produced or did not disclose.  And these are all
25 documents and correspondence in their control and possession.

1          Number 3, correspondence between defendant and
2   Verlag Herder.  And defendant released document 2182.
3          Now, on June 26, after being compelled, they
4   released some more emails on August 29th.  And here on the
5   left you'll see the documents that we produced, plaintiff, and
6   on the right you'll see the documents that they -- defendant
7   produced or did not disclose.
8          And so we're seeing a pattern here of documents,
9   correspondence that are not being disclosed here and we're
10  asking for full disclosure.
11         And this is a threshold question.  This is a
12  statement that they make before the filing of suit saying that
13  we've done an extensive audit of our correspondence files and
14  publication history.  These are -- these are items that
15  shouldn't be attorney/client privilege unless there's
16  communications accordingly.  But communications to third
17  parties about rights, whether or not they have any, whether or
18  not they can acquire some, is not privileged and they're not
19  disclosed.
20         So with this request number 11, we would ask that
21  they be compelled to fully disclose all their correspondence
22  between these three parties in their possession or control and
23  have them unprotected, not attorney/client, unless it is with
24  an attorney.
25         Your Honor, I have a quick question for the Court.

1  We have eight requests --

2          THE COURT:  Proceed.

3          MR. ISHMAN:  Go one by one?

4          THE COURT:  It's your presentation, sir.

5          Do you want to respond en masse or one at a time?

6          MS. POTTER:  Your Honor, Natalie Potter with Essex

7  Richards also representing the defendant, Saint Benedict

8  Press.  It might be easier for the Court if we respond one by

9  one.

10          THE COURT:  Proceed.

11          MS. POTTER:  Okay.  Thank you, Your Honor.

12          First, in regards to request number 11, I want to

13  give a little bit of background as to how this letter and

14  statement came about.  Saint Benedict Press purchased TAN, its

15  predecessor in interest, out of bankruptcy in 2008, 2009.  As

16  part of that bankruptcy proceeding, Saint Benedict Press

17  received thousands of pages of documents and files related to

18  numerous books.  One group of those documents and files

19  include what we call the Herder -- the B. Herder files.  The

20  B. Herder files included books that TAN had acquired from the

21  publisher B. Herder back in the '70s, at some point in the

22  early '70s; and as part of the acquisition, our client

23  received all of those files.

24          And I don't -- I'm not going to testify for our

25  client here.  He has his deposition coming up in two weeks.

1   But I think what plaintiff thinks that statement means and
2   what that statement actually meant are two totally different
3   things.  Prior to writing that letter, our client reviewed
4   five -- approximately five 5-foot-tall cabinet files of
5   documents related to the B. Herder files because that's where
6   the book at issue originated from was from the B. Herder
7   initial acquisition by TAN in the '70s.

8           So our client -- each file included correspondence,
9   a publication file, edits and things.  There were no computers
10  back then.  This was done manually by our client.  And so I
11  think there's perhaps a misunderstanding on plaintiff's part
12  as to what that meant.  This is a statement in a letter, Your
13  Honor, that our client made prior to this lawsuit ever being
14  filed, prior to us being retained, where our client says, "In
15  response to your letter" -- he's responding to Baronius
16  Press's letter -- "TAN has conducted an extensive audit of our
17  correspondence files and publications history for *Fundamentals*
18  *of Catholic Dogma*."  So again, I think what plaintiff thinks
19  should be included and what was actually included are two
20  different things.

21          We objected because if we were going to comply the
22  way plaintiff wanted us to, we would have to produce five
23  5-foot-tall cabinet files full of documents that are
24  completely unrelated to this case, dealing with other books
25  that were acquired during the B. Herder acquisition from the

1  '70s.

2       What we did produce were all documents in our

3  publication file dealing with the acquisition of this

4  particular book.  Everything that we had historical wise that

5  was related to this particular work we produced.  We also

6  produced slip sheets identifying those documents -- we Bates

7  stamped those slip sheets -- TAN publication file, marketing

8  history.  And so I just -- we have complied.

9       On February 2nd, 2018, we responded in a letter to

10  Mr. Ishman that we have produced everything that we had that

11  was relevant to this case and -- in terms of the historical

12  extensive audit that was done.  We've produced it.  We have no

13  other documents to produce.

14       THE COURT:  Okay.  Next.

15       MR. ISHMAN:  Real quickly if I could follow up on

16  one thing.  They did talk about the purchase of TAN out of

17  bankruptcy.  None of those documents have been produced.

18  Certainly --

19       THE COURT:  Do you dispute that it happened?

20       MR. ISHMAN:  I dispute what was purchased.  That's

21  the essence of the case.

22       THE COURT:  Do you not have access to that file

23  also?

24       MR. ISHMAN:  No.

25       THE COURT:  Why not?  It's a public -- public

1   proceeding.  Why can't you go to the bankruptcy court and get

2   that?

3            MR. ISHMAN:  There is a -- one of the open items is

4   this particular bankruptcy issue and I will definitely address

5   it then.  It's not addressed -- *Fundamentals* is not addressed

6   in the documents that we looked at on Pacer.  We spent a

7   substantial --

8            THE COURT:  They're telling you they've given you

9   everything they've got in their files that they got from TAN

10  that deals with *Fundamentals*.

11           MR. ISHMAN:  I'll move on, Your Honor.

12           THE COURT:  Please do.

13           MR. ISHMAN:  Request number 12.  In that same

14  letter, Exhibit 2 to the complaint, "We have devoted

15  significant time and resources to this process and consulted

16  two independent copyright attorneys."

17           The short end of why we raised this merely is

18  they've claimed that there are no engagement letters and that

19  they've spoken with them.  We just don't want to have any

20  surprises.  They haven't identified any documents that are

21  material.  So we just want to make sure there won't be any

22  exhibits coming out because nothing has been produced from

23  these three people.  And that's the mere purpose of bringing

24  that up here today, that there's been identified in the

25  privilege log on the dates that they've been retained and

1  nothing more will be coming up, no more surprises with these
2  three individuals.
3          MS. POTTER:  Thank you, Your Honor.
4          Your Honor, just to clarify, the request asks for
5  our client to produce all documents generated from TAN's
6  consultation with two independent copyright attorneys that
7  support your quoted statement below that Conor Gallagher, vice
8  president of TAN, where he says we have devoted significant
9  time and resources to this process and consulted two
10 independent copyright attorneys.
11         We objected on the basis of privilege, Your Honor.
12         THE COURT:  It's clear.
13         MS. POTTER:  Thank you.
14         THE COURT:  Sir, 15.
15         MR. ISHMAN:  Fifteen.  In that same exhibit,
16 "Defendant, however, maintains publication rights in
17 *Fundamentals*, as the successor-in-interest to B. Herder of St.
18 Louis, to whom Mercier Press granted exclusive U.S.
19 co-publication rights."
20         This is a very -- this is a threshold statement of
21 this case.  Defendant has put this -- these verbatim words in
22 each book of *Fundamentals* that they have published as well as
23 in correspondence discussing *Fundamentals*.  And if this is --
24 this is the threshold issue.  They have yet to produce any
25 documents to support that they are the successor-in-interest.

1          When we asked about that, their response on
2   November 24th is see all documents produced, without
3   referencing any.  See them all.
4          On February 2nd when we asked for them to
5   supplement, their response, "Whether or not Saint Benedict
6   Press has produced documents sufficient to defeat your
7   client's claim and support Saint Benedict's defenses, is
8   something for a judge or jury to decide."
9          We're asking for documents to -- this is the
10  threshold issue.  If they're a successor-in-interest, this
11  case goes away.  We've asked for these documents.  We've asked
12  for this agreement.  We've asked for these things.  They have
13  not produced it.  Discovery has ended September 28th.  They
14  have not produced these documents.  They haven't referenced a
15  Bates number.  They said see it all.
16         On June 26th, defendant is now going to produce an
17  updated privilege log.  If that's your professional statement
18  that you publish in every book and every correspondence and
19  you state it in this letter, what's -- I don't understand
20  what's privileged about this.
21         So on July 13th, certainly there must be documents
22  that show that defendant maintains publication rights in
23  *Fundamentals* as the successor-in-interest to B. Herder of St.
24  Louis, to whom Mercier Press granted exclusive U.S.
25  co-publication rights to.

1       The current status of this is that these

2   documents -- no documents have been produced particular to

3   this request.  Mercier Press only granted exclusive U.S.

4   distribution rights to B. Herder and not co-publication

5   rights.

6       What B. Herder did is they always printed in

7   Ireland.  They never published here in the U.S.  So it's

8   plaintiff's position that defendant has never been a

9   successor-in-interest to B. Herder as to -- as to who had to

10  publish it.  So B. Herder was purchased by Herder-Bleile,

11  Inc., who was the real successor-in-interest to B. Herder.  So

12  that's the evidence that we have, the real

13  successor-in-interest to B. Herder.

14      Defendant likely purchased either stock or some

15  rights to distribute books, but they're not the -- they are

16  not the successor-in-interest.

17      We had a deposition last week with Mary Francis

18  Lester who's an ex-employee of TAN who worked there from 1974,

19  and her testimony concerned the contract with B. Herder.  She

20  was -- inquired with the old owner of TAN books, and emailed

21  the defendant on October 22nd stating -- and a copy of this is

22  in tab 17 at the very end, but we've cut and pasted it here.

23      "I asked Tom Nelson, but he had no idea where the

24  contract would be.

25      "Tom recalls that he made two separate contracts

1  with B. Herder -- one for inventory and one for rights.  B.
2  Herder turned over to TAN the individual contracts that B.
3  Herder had made with authors for individual titles, and Tom
4  says he presumes that the agreement was that TAN was supposed
5  to honor those contracts.  (Tom said there might have been
6  three contracts between TAN and B. Herder, with the third one
7  covering the B. Herder titles that hadn't been covered in the
8  earlier agreements, since Tom had at first aimed to purchase
9  only some of the B. Herder titles, but then decided to
10 purchase all.)"

11          She later testified where these files may be:  In
12 the publication files in the accounting office; in the
13 foundational company documents; in a general file of the B.
14 Herder filing cabinet; inside a corporation record book.

15          So what TAN had a history of is getting contracts,
16 never signing them, never paying them, and that was her
17 testimony.  And she had great question about what rights TAN
18 ever had, if any.

19          And so when we go back to this threshold issue of
20 maintains publication rights in *Fundamentals*, this is a
21 threshold issue.  This case can quickly be resolved if we can
22 cite to a Bates number that says this is what occurred.  They
23 can't.  Discovery is over with and we've been working through
24 this.

25          So to be a successor-in-interest, you must acquire

1    the company.  It's not an asset purchase.  And so that's why

2    that agreement of what they acquired in bankruptcy is so

3    fundamentally important.

4           And there's a next question that actually deals with

5    that, but I'll rest right here on this production request

6    number 15.

7           THE COURT:  Ms. Potter.

8           MS. POTTER:  Thank you, Your Honor.

9           First of all, I would say that we did produce

10   bankruptcy documents.  We also provided the specific Bates

11   number range where those documents are at in our production.

12          Second of all, Your Honor, I'd like to say that what

13   I believe plaintiff is looking for is a contract from the

14   '70s.  Again, this would be included in those files that we

15   had where Mr. Nelson, who is the original owner of TAN, his

16   name was Thomas A. Nelson, where Mr. Nelson purchased the

17   assets from B. Herder which included *Fundamentals*.  That's our

18   position.  That goes to the heart of the case.  We believe we

19   have strong arguments in that way.  I'm not here to argue that

20   today.

21          We have letters that we've given to plaintiff, and

22   that's what he's referring to, that talks about this contract.

23   We have not been able to find this contract.  If we were able

24   to find it, we think that it would be to our benefit and help

25   us enormously.  We have not been able to locate the contract.

1  It was from the '70s.  Ms. Lester was an employee from 1974
2  until TAN entered bankruptcy and was purchased by Saint
3  Benedict Press which was 2006, 7, 8, something like that.  And
4  Ms. Lester testified that when she was an employee there prior
5  to our client acquiring TAN, they couldn't find the contract.
6  The contract is missing.
7          On February 2nd, 2008, we informed plaintiff that we
8  have given them all documents.  We have no other documents to
9  give.  We have no other documents to give.  These historical
10 documents we simply don't have.  We can't produce what we
11 don't have.  We actually think that it would be to our benefit
12 and help tremendously if we had it, but we don't have it.  We
13 just don't have anything else.  We have given what we have.
14          That's all I have, Your Honor.
15          THE COURT:  Okay.
16          MR. ISHMAN:  In closing, again, interrogatory
17 request number 1, identify what the documents are responsive
18 to.  If they actually answered that interrogatory to this
19 request and others, these issues are resolved.  So we would
20 ask that they be compelled to identify all documents that are
21 responsive to this by Bates number and not just state see all
22 documents.  I mean, this is a very, very specific question and
23 a statement that is threshold to resolving this dispute.
24          Next, request number 18.  In that same letter by
25 Mr. Gallagher, "Our publication rights to *Fundamentals* have

1  been recognized by the United States Bankruptcy Court for the
2  Northern District of Illinois, Western Division."

3         "Publication rights recognized," very specific
4  words.  We asked for you to produce those documents.

5         So, Your Honor, if you would recognize rights, I'm
6  sure there would be trial transcripts, an order that would
7  recognize these rights.  Very -- there's nothing confusing
8  about this statement.

9         The response we received, "Defendant objects to this
10 Request to the extent it seeks to discover documents and
11 things protected by the attorney/client privilege, the
12 attorney work product doctrine, or that constitute material
13 prepared in anticipation of litigation or for trial."  Subject
14 to and without waiving the foregoing, see documents 297 to 649
15 produced contemporaneously with these responses.  "Additional
16 relevant, responsive documents may be in the custody of the
17 United States Bankruptcy Court, Northern District of Illinois,
18 file numbers 96-53329 and 05-70657.  Such documents may be
19 obtained through Pacer."

20         On November 24th they state, "No other documents to
21 produce at this time."

22         So they have not produced any -- any statement by
23 the United States Bankruptcy Court that their rights, Saint
24 Benedict Press, to *Fundamentals* was recognized by this Court.
25 Very simple statement that they put out there to support that

1  they had a right.

2          On June 26th, after being compelled defendant is

3  producing an updated privilege log.

4          Should -- then this is where they state, Should

5  plaintiff depose defendant's representative who made the

6  statement, Conor Gallagher, it is expected that Mr. Gallagher

7  will be able to explain how he came to the conclusion

8  referenced.  This is -- this is not a mystery.  This is a

9  simple statement.  Publication rights recognized by the United

10  States Bankruptcy Court coming from a licensed attorney.

11  Where are the documents that support that?

12          So defendant should be compelled to produce these

13  documents that actually state that or have an adverse

14  admission that that is a false statement by Mr. Gallagher.

15  Discovery is over with as of September 28th.

16          We have spent hundreds of hours -- we have spent

17  lots of hours looking through the bankruptcy courts, looking

18  through the docket, looking through these documents.  We could

19  not find the reference to *Fundamentals* in this statement.

20          Thank you, Your Honor.

21          MS. POTTER:  Your Honor, in regards to request

22  number 18, what plaintiff is referring to is a letter that our

23  client wrote five years ago prior to this case being filed,

24  prior to us being retained.  Our client said, "Our publication

25  rights of *Fundamentals* have been recognized by the U.S.

1  Bankruptcy Court for the Northern District of Illinois."

2      In our initial responses to their discovery requests

3  on November 24, 2017, we produced a chunk of documents from

4  the bankruptcy case that were -- was in our client's

5  possession.  We produced those documents to him.  We gave him

6  and identified the Bates stamp number in our initial response

7  to those documents which he just referenced here.

8      Again, I think what plaintiff thinks the answer is

9  and what the answer is is different.  We have produced -- this

10 is a request for production of documents.  This is not an

11 interrogatory.  And we have produced all documents in our

12 possession that are relevant to that request and we informed

13 him of that on February 2nd, 2018.

14     Our client has a very good reason as to why he wrote

15 that statement, his thoughts surrounding that statement and

16 where that statement came from, and he will testify to that.

17 He'll have an opportunity to testify to that in his deposition

18 two weeks from now.  But we have no other documents to give.

19 But there is a multitude of reasons why our client made that

20 statement and our client will be prepared to testify about

21 that during his deposition.  But we have no other documents to

22 give.

23     THE COURT:  Okay.

24     MR. ISHMAN:  We would like an adverse admission on

25 that or a statement that no documents exist to verify that

1  statement.

2  THE COURT:  Well, we have an officer of the court

3  standing up in court saying they don't exist.  Okay.  What

4  more do you want?  If you want a transcript, you can buy one.

5  MR. ISHMAN:  Request number 21.  Thank you, Your

6  Honor.

7  That same exhibit to the complaint, "After extensive

8  expert review and public notice, the Court certified

9  Defendant's publication rights to *Fundamentals* by name when

10  Saint Benedict press LLC acquired Defendant in 2008."

11  This request seeks a certification.  It was never

12  certified.  The sale was as is.  It didn't assume any rights.

13  It was a purchase.

14  On November 24th we were directed to go to Pacer.

15  On November 24th, "Given the broad nature of the original

16  request, Saint Benedict" -- it's the same response as number

17  18.

18  So again, this is plain English that they wrote, the

19  Court certified defendant's publication rights.

20  THE COURT:  I take it you're going to ask

21  Mr. Gallagher about that in his deposition.

22  MR. ISHMAN:  Yes, Your Honor.

23  THE COURT:  Okay.  And I take it the answer from the

24  defense is the same.

25  MS. POTTER:  Yes, Your Honor, it is.

1    THE COURT:  We supplied you with all the dern
2 documents we've got.
3    MS. POTTER:  That's exactly right, Your Honor.  And
4 I will just say, we did not -- I just want to clarify.  We did
5 not just refer him to Pacer.  We provided him a stack of
6 documents from the bankruptcy court that was in my client's
7 possession.
8    THE COURT:  Okay.  Anything else?
9    MR. ISHMAN:  I'll try to make this brief based on
10 the direction we're going.
11    Request number 22, "The Court conducted an extensive
12 expert review and public notice of TAN's publication rights to
13 *Fundamentals*."
14    So we've asked for them to produce documents that
15 support TAN's statement that the Court conducted an extensive
16 expert review.  And again, it was the same answers by
17 defendant on the 24th, on the 26th.  So defendants should be
18 compelled to produce it or have a statement of fact that no --
19 that there are no documents.
20    MS. POTTER:  Your Honor, our answer is the same.
21 It's the bankruptcy.  It's the letter written five years ago.
22 It's the same issue that we've talked about twice now.  On
23 February 2nd, 2008, we told him we don't have any more
24 documents.  We have no other documents.
25    THE COURT:  Okay.

1    MR. ISHMAN:  Moving on to request number 32.  "In
2  Defendant's Response to First Set of Written Discovery
3  Requests, Production Request No. 32, Defendant responded to
4  this request as follows:

5    "Produce all documents (request letters from
6  prisoners, Defendant cover letters, postage receipts,
7  bookkeeping records, etc.) related to each gift or donation of
8  *Fundamentals* from 2000 to the date Defendant answers this
9  request."

10    And on November 24th they produced certain documents
11  which is tab number 9.  In there they put in a note on a short
12  entry that the paper book edition is listed out of stock and
13  there are six items sold.  So we're looking for those six
14  copies that they have identified in their accounting records.

15    And again, we get the response, "Whether or not
16  Saint Benedict has produced documents sufficient to defeat
17  your client's claim and support Saint Benedict's defenses, is
18  something for a judge or jury to decide."

19    So defendant did not produce any documents related
20  to each gift or donation and we ask that they do that because
21  that's a key element of their defense so there's no surprises
22  now that discovery has ended.

23    THE COURT:  Well, I take it that if we go to trial
24  with this mess, that that would be a point at which you may
25  make that point.

1    What else -- same response?

2    MS. POTTER:  Our response is, Your Honor, we have

3 informed plaintiff's counsel many times there were no E-book

4 sales, there were no audio book sales.  We understand what

5 that statement says; and when our client is deposed, our

6 client can explain that.

7    In a February 2nd, 2018, letter I informed plaintiff

8 we have no other documents to give --

9    THE COURT:  All right.  I think that I have reviewed

10 all of these documents and read the briefs and arguments of

11 counsel in writing and I have heard enough today to rule on

12 all of these matters that are pending today.

13    This is a copyright infringement case.  Who has the

14 rights to the publication of *Fundamentals of Catholic Dogma*?

15 The plaintiff has moved to compel discovery responses.  Nobody

16 has asked me for a discovery conference so -- prior to the

17 filing of this motion.  And in brief, the plaintiff argues the

18 defendants have failed to respond to document request 8, now

19 withdrawn, 11, 12, 15, 18, 21, 22, 32, 42, and 43, that they

20 have failed to produce documents referenced in documents Bates

21 stamped SBPP-00222, 00241, 00267, and 02200 and failed to

22 respond to interrogatory number 1.

23    Plaintiff has withdrawn its motion as to request for

24 production number 8.

25    With regard to request for production 11, 15, 18,

1  21, 22, 32, 42, 43, as well as documents related to SBPP-0222

2  and interrogatory number 1, defendant has represented in its

3  brief and to the plaintiff that it has produced all

4  privileged, relevant, responsive documents in its possession,

5  custody and control.

6         Do you adopt that representation now?

7         MS. POTTER:  Yes, Your Honor, we do.

8         THE COURT:  Very well.  The position from the

9  plaintiff is, no, you haven't.

10        MS. POTTER:  Non-privileged, Your Honor.  I think --

11  I think there was -- I think you said privileged.

12        THE COURT:  All non-privileged documents.

13        And the plaintiff's position basically is, no, you

14  haven't.  And you have reiterated that representation to the

15  Court as an officer of this court and it's going to be left at

16  that.  Motion to compel is denied as to these items.

17        In regard to number 12, the defendant argues it

18  submitted an updated privilege log that was inadvertently

19  failed to be attached to an earlier email but has produced it

20  on June 26.  Plaintiff claims the log is insufficient and

21  defendant needs to answer what each attorney was engaged for

22  and the date of engagement, and I deny that as well.

23        As to the defendant's failure to produce documents

24  referenced in SBPP-00241, 00267, and 02200, the defendant

25  notes these items were requested for the first time in a

1  letter from the plaintiff on May the 10th and not through

2  proper discovery requests.  Moreover, defendant claims they

3  are overly broad, and for these reasons the motion should be

4  denied.  And I do so.

5        I understand that this case is difficult because the

6  work was originally published in the 1950s.  And I would

7  imagine that many things the plaintiff seeks simply do not

8  exist anymore.  It sounds to me like the defendants are doing

9  their best to respond and plaintiff thinks they're not doing

10 enough.  So I'm going to deny all those motions to compel.

11       I note that there is another packet of stuff.  I

12 also note you people are in the same business.  You've already

13 probably spent more than you can make off the publication of

14 *Fundamentals* for the lifetime of everybody in this courtroom.

15 This is an example of the craziness that attends federal

16 litigation when people get into the weeds on this stuff.

17       Discovery is over with except for this stuff that's

18 pending and the deposition of Mr. Gallagher.  Is that it?

19       MR. BUCHAN:  Your Honor, not exactly.  We have

20 depositions the whole week of October 15 through 19 of

21 numerous back-to-back, at plaintiff's request for his client

22 to be here in the United States, and then, again, spilling

23 over for a couple witnesses the following week.

24       But written discovery is over, document production,

25 all of that, on September 28.  But we do have deposition

1  discovery and we do have an expert report from our

2  deposition -- excuse me, our expert witness on damages due

3  October 15th.

4          THE COURT:  All right.  I will schedule another

5  hearing on this pending stuff.

6          MR. BUCHAN:  Yes, sir.  Your Honor, we -- could I

7  just mention this?  We did follow -- we did follow what the

8  Court told us to do and asked for a conference on our motion

9  to compel.  We have not filed that.  We would like those

10 issues to somehow be addressed.

11         THE COURT:  File it.

12         MR. BUCHAN:  File it.  Thank you, Your Honor.

13         THE COURT:  And we'll deal with it.

14         All right.  Get me up an order.  I'm going to check

15 my calendar.  It might be helpful if you two get together and

16 give me some proposed dates in November where I could proceed

17 with this stuff after your depositions because I know you've

18 got to get ready for those.

19         MR. BUCHAN:  Right.

20         THE COURT:  Okay.

21         MR. BUCHAN:  Are we now going to move into status

22 conference after this?

23         THE COURT:  The status conference is this.  I'm

24 going to have a hearing on this pile of stuff.

25         MR. BUCHAN:  Okay.  Your Honor, as long as -- I

1  think the Court had mentioned in its order that it would want
2  to discuss the -- or maybe in a status conference after the
3  hearing, the motion -- hear from us a little bit, I guess, on
4  the motion to amend, motion to extend time.
5          THE COURT:  I'll hear all of that at the same time.
6          MR. BUCHAN:  Okay.
7          THE COURT:  Okay.  That will all be heard at the
8  same time.  You guys get together and see if you can produce
9  some common dates where you will both be available to proceed
10 with another hearing.  We will do so and will address motions
11 to amend, et cetera, and your motions to compel.  Go ahead and
12 file them.
13         MR. BUCHAN:  Thank you, Your Honor.
14         THE COURT:  And then we'll proceed with that.
15         This is astonishing that you both cannot work
16 something out on a reasonable business basis when you're
17 talking about minuscule amounts of money in these very
18 specific markets.  I mean, there's not, I imagine, a huge
19 market for *Fundamentals of Catholic Dogma*.  You're talking
20 about something that would be arcane to -- and mostly of
21 interest to scholars and theologians and serious lay people.
22 So I don't know, should I ask the bishop to get involved?
23         MR. BUCHAN:  Your Honor, just so the Court won't
24 think the parties haven't been trying to be diligent about
25 resolving this, we had in either late July or early

1 │ August 2017 a full day settlement conference between the
2 │ parties by all the other plaintiffs -- plaintiff's client was
3 │ in his -- in Europe.  But we had -- that lasted almost all
4 │ day.  In November we had a mediated settlement conference.
5 │ And then when Mr. Kejik representing the plaintiff was here in
6 │ March or April for -- this year for his deposition, at the end
7 │ of that we had several more hours of discussions.  And we've
8 │ tried and we would welcome opportunities to do that.

9 │          THE COURT:  I know the family you represent and have
10 │ high regard for them.  I've known them for basically most of
11 │ my life and so I believe what you're telling me.

12 │          MR. BUCHAN:  Your Honor, if I can say one last thing
13 │ on that is -- I lost my thought here for a minute.

14 │          We even -- Your Honor, we have made an offer of
15 │ judgment which was declined, so that is part of -- as brought
16 │ up in our response to the motion to amend, a very important
17 │ part of the prejudice we think will occur if that motion to
18 │ amend is allowed.

19 │          THE COURT:  Yeah, I will not make a ruling at this
20 │ point, but it seems to me like this case is adequately
21 │ complicated as it is, but we'll deal with all that in the next
22 │ hearing.  Get your response to us on any dates that you both
23 │ can be available and we will schedule a follow-up hearing and
24 │ deal with motions to amend and all that other good stuff.

25 │          All right.  Thank you very much.  We're now in

1    recess.

2            (End of proceedings at 11:24 a.m.)

3                              *****

4    UNITED STATES DISTRICT COURT

5    WESTERN DISTRICT OF NORTH CAROLINA

6    CERTIFICATE OF REPORTER

7

8

9            I, Cheryl A. Nuccio, Federal Official Realtime Court

10   Reporter, in and for the United States District Court for the

11   Western District of North Carolina, do hereby certify that

12   pursuant to Section 753, Title 28, United States Code, that

13   the foregoing is a true and correct transcript of the

14   stenographically reported proceedings held in the

15   above-entitled matter and that the transcript page format is

16   in conformance with the regulations of the Judicial Conference

17   of the United States.

18

19            Dated this 18th day of October 2018.

20

21

22                    s/Cheryl A. Nuccio

23                    _____
                      Cheryl A. Nuccio, RMR-CRR
24                    Official Court Reporter

25